RECEIVED
IN ALEXANDRIA, LA.

MAR 0 8 2010

TONY R. MOORE, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| ANN DESHOTELS, ET AL | : | DOCKET NO. 08-1378 |
| VS. | : | JUDGE TRIMBLE |
| GREGORY PAUL NORSWORTHY, ET AL | : | MAGISTRATE JUDGE KAY |

### MEMORANDUM RULING

Before the Court is a "Motion for Summary Judgment" (doc. #62) filed by defendants, Anthony Mancuso, in his official capacity as the Sheriff of Calcasieu Parish, Michael Marshall, a corporal with the Calcasieu Parish Sheriff's Office, Travis Miller, a deputy sheriff with the Calcasieu Parish Sheriff's Office, and St. Paul Fire & Marine Insurance Company. The Court will assume that Defendants, Mancuso, Marshall and Miller are being sued only in their official capacity because they have been identified in their official capacity, and the Plaintiffs have not named these defendants in their individual capacity. These defendants seek dismissal from the instant lawsuit pursuant to Federal Rule of Civil Procedure 56.

### FACTUAL STATEMENT

Dr. Sheldon J. Deshotels, Jr. relocated to Lake Charles for employment as a Pathologist; he resided at 5246 Nelson Rd. at the Nelson Pointe Apartments.[1]  On November 1, 2007, at approximately 9:30 p.m., Dr. Deshotels was seen by Ann Norsworthy in Mrs. Norsworthy's garage.[2]

---

[1]  Sheriff's exhibit B, Ann Deshotels depo. pp. 59-61.

[2]  Sheriff's exhibit C, Cherie Norsworthy depo. p. 12, lines 11-12.

Believing that Dr. Deshotels was there to see her husband, Greg Norsworthy, Mrs. Norsworthy opened the door and asked Dr. Deshotels if he was looking for Greg. Neither Mr. or Mrs. Norsworthy were acquainted with Dr. Deshotels.[3] Immediately, Dr. Deshotels ducked and quickly exited the garage.[4] Realizing that Dr. Deshotels was not there to see Mr. Norsworthy, Mrs. Norsworthy "hollered for her husband."[5]

After hearing his wife's scream, Mr. Norsworthy was informed by her that a man was in their garage, therefore he instantly began looking for Dr. Deshotels.[6] Mr. Norsworthy drove his four wheeler ATV around the neighborhood until he located Dr. Deshotels running back to the Nelson Pointe Apartments.[7] Meanwhile, Mrs. Norsworthy called the Lake Charles Police Department ("LCPD") who informed her that because her home was located outside the city limits, the Calcasieu Parish Sheriff's Office ("CPSO")") had jurisdiction. Thus, she contacted the CPSO.[8]

Mr. Norsworthy, a trained mixed martial artist, caught up with Mr. Deshotels right outside the Nelson Pointe Apartments[9] and applied a carotid artery hold on him which temporarily incapacitated him by rendering him unconscious.[10] After Mr. Norsworthy released the carotid artery

---

[3] Sheriff's exhibit A, Greg Norsworthy depo. p. 24, lines 7-12.

[4] Sheriff's exhibit C, Cherie Norsworthy depo. p. 12, lines 14-17.

[5] *Id.* p. 16, line 25.

[6] Sheriff's exhibit A, Greg Norsworthy depo. p. 44, lines 9-13.

[7] *Id.* at p. 55, lines 2- p. 61, line 24.

[8] Sheriff's exhibit C, p. 21, lines 10-11.

[9] The Nelson Pointe Apartments is located just inside the city limits of Lake Charles. Sheriff's exhibit A, p. 54, lines 11-15.

[10] Sheriff's exhibit A, Greg Norsworthy, p. 68, line 1 - p. 72, line 15.

hold, Dr. Deshotels regained consciousness and sat on the ground of the Apartments until law enforcement arrived.[11]

A truck carrying two ladies and a man entered the Apartment parking lot.  Mr. Norsworthy instructed them to call the police; he told them that Dr. Deshotels had burglarized his home.[12]  One of the ladies, Jessica Cob, made the call to the police department.  Plaintiff disputes the testimony of Mr. Norsworthy wherein he told Jessica Cob that Dr. Deshotels had "burglarized" his home.[13]  Ms. Cobb testified in her deposition that Mr. Norsworthy told her that "the man had broke into his house."[14]

Because the Norsworthy residence was outside the city limits and the Apartments were inside the city limits, both the CPSO and the LCPD responded to the incident.[15]  LCPD Officer Jeff Pittman was the first law enforcement officer to arrive.  Officer Pittman testified that Mr. Norsworthy informed him that "he was the complainant and that the suspect in the burglary was the white male on the ground."[16]  Plaintiff disputes this fact[17] but provides no contradictory evidence.  Shortly after Officer Pittman arrived, Dr. Deshotels rose to his feet and began running toward Nelson Road.[18]

---

[11] *Id.* p. 72, lines 19-25.

[12] *Id.* p.74, line 4 - p. 76, line 1.

[13] Plaintiffs' "Statement of Material Facts as to Which There Exists a Genuine Issue to be Tried", ¶ 1.

[14] Plaintiffs' exhibit 2, p. 12, lines 13-14.

[15] Sheriff's exhibit D, Marshall depo. p. 33, line 19 - p. 34, line 13.

[16] Sheriff's exhibit E, p. 47, lines 17-18.

[17] Plaintiffs' statement of material facts, ¶ 2.

[18] Sheriff's exhibit E, Pittman depo. pp. 47-51.

Officer Pittman chased Dr. Deshotels and overtook him causing him to fall to the ground on his stomach.[19] Officer Pittman positioned himself with his knees "on either side of him [Dr. Deshotels] in the lower back/upper buttocks region, up kind of in a straddle position."[20] Dr. Deshotels' hands were underneath him[21] as he resisted Officer Pittman's request to put his arms behind his back.[22] Hence, there was a struggle to place the handcuffs on him.

During the struggle, CPSO Deputies Michael Marshall and Travis Miller arrived and began assisting Officer Pittman in handcuffing Dr. Deshotels and placing him in custody.[23]  Shortly thereafter, but also during the struggle, LCPD's Corporal Jeff Morgan and Corporal Kevin O'Rourke arrived to assist.  Plaintiff disputes this and alleges that "[t]he "assistance" provided by O'Rourke consisted of deployment of a Taser in drive stun mode against Dr. Deshotels, after he was under control of Marshall, Miller, Morgan and Pittman, and while Dr. Deshotels was defenseless."[24] Plaintiffs dispute that Dr. Deshotels attempted to move his hands under his "stomach."[25] However, Plaintiffs fail to submit contradictory evidence.  When Officers Morgan and O'Rourke arrived, one of them grabbed Dr. Deshotels legs and folded or pushed them up towards his back.[26] Deputy Miller

---

[19] Plaintiffs' exhibit 7, p. 58.

[20] *Id.* p. 58, line 24 - p. 59, line 1.

[21] *Id.* p. 59, lines 17 - 20.

[22] *Id.* at p. 61.

[23] Sheriff's exhibit D, Marshall depo. p. 41, lines 5-6, p. 42, lines 21-23, p. 47, lines 2-3; Sheriff's exhibit F, Miller depo. p. 32, lines 8-16; Plaintiffs' exhibit 7, Pittman depo. p. 64.

[24] Plaintiffs' statement of material facts, ¶ 4.

[25] *Id.* ¶ 5.

[26] Plaintiffs' exhibit 5, Marshall depo. p. 49, lines 13-15.

4

was kneeling on Dr. Deshotel's right shoulder and Officer Pittman had his left arm in handcuffs.[27]

As the struggle to handcuff Dr. Deshotels continued, Deputy Miller reached for his Taser, but before he could apply it, LCPD"s Corporal O'Rourke yelled "Taser, Taser, Taser" and then tasered Dr. Deshotels.[28] After the first taser, Dr. Deshotels continued to struggle, therefore, Corporal O'Rourke applied a second taser which resulted in Dr. Deshotels ceasing all resistance and being handcuffed face down with his hands behind his back.[29]

After Dr. Deshotels was handcuffed, Officer Pittman and Deputy Marshall attempted to lift him from the ground, however, he was unable to stand under his own power.[30]   They also observed that his face was turning a purple color and he was not breathing.[31]   Thus, they set him back on the ground, unhandcuffed him and rolled him on his back.[32]   Meanwhile, three (3) other LCPD officers arrived, Officers John Thacker, Robert McCauley and Larry Moss.  These officers observed Dr. Deshotels being dragged as "dead weight and that his color was blue."[33]   Officer McCauley testified that:

> [w]hen I got close where I could see him up close, his color wasn't right, and that's

---

[27]  *Id.* at p. 52, lines 2-7.

[28]  Sheriff's exhibit F, Miller depo. p. 34, lines 23-25, p. 34, lines 9-10; Sheriff's exhibit E, Pittman depo. p. 117, lines 14-15; Plaintiffs' exhibit 5, Marshall depo. pp. 47, 49, 52 and 55; Plaintiffs' exhibit 6, Miller depo. p. 36.

[29]  Plaintiffs' exhibit 5, Marshall depo. p. 53; Plaintiffs' exhibit 6, Miller depo. p. 37; Plaintiffs' exhibit 7, Pittman depo. p. 72.

[30]  Sheriff's exhibit D, Marshall depo. p. 56, lines 6-20.

[31]  *Id.* at p. 57, lines 16-25.

[32]  *Id.* at p. 57.

[33]  Plaintiffs' exhibit 8, McCauley depo. p. 35.

when we started telling them to get him out of handcuffs, get him on his back, and we started trying to figure out what's wrong with this guy, and that's - - when we got him on his back and we started trying to get a pulse and check his breathing, that's when we realized he had a pulse, but he wasn't breathing.[34]

At some point an ambulance was summoned.[35] Noticing that Dr. Deshotels tongue appeared to be blocking his airway and his nose was clogged with blood, Officer McCauley, while Officer Moss held Dr. Deshotel's head,  attempted to move Dr. Deshotels' tongue with a pen in order to allow him to breathe.[36] After pushing his tongue out of the way of his airway, Dr. Deshotels took a large gasp of breath and started breathing.[37] When Officer McCauley saw the ambulance arrive, he and Officer Moss discontinued their efforts to assist Dr. Deshotels.[38]

Plaintiffs dispute that either Officers attempted to open Dr. Deshotels' mouth because if they had, they would have observed that his airway was completely occluded with vomit.[39] Plaintiffs provide the deposition testimony of Walter Siefford, the Acadian Ambulance EMT/paramedic. Mr. Siefford testified that when he arrived, Dr. Deshotels was lying on his back and a single officer was attempting to pry open Dr. Deshotels' clenched jaw with a Bic pen.[40] Dr. Deshotels had vomited,

---

[34] Plaintiffs' exhibit 8, McCauley depo. p. 36, lines 1-8.

[35] Plaintiffs' exhibit 5, Marshall depo. p. 63.

[36] Sheriff's exhibit G, McCauley depo. pp. 41-42.

[37] *Id.* at p. 45, lines 8-12.

[38] *Id.* pp. 46-47.

[39] Plaintiffs' statement of material facts, ¶ 9.

[40] Plaintiffs' exhibit 11, Siefford depo. pp. 24-25, 27, 28.

while on his back and his face was covered with and his mouth was full of vomit.[41]  There was vomit

on the ground on both sides of Dr. Deshotel's face.[42]  Mr. Siefford saw only one officer attempting

to assist Dr. Deshotels, and the other officers had gathered some distance away in the parking lot.[43]

The EMTs then assisted Dr. Deshotels for 33 minutes; they attempted to intubate him twice.[44]

Their first attempt was unsuccessful because the tube was clogged with vomit.[45]  A second tube was

inserted by the EMTs.[46]  Dr. Deshotels was transported to Women's and Children's Hospital, which

was one mile away. He was later pronounced dead at the Hospital.[47]

Calcasieu Parish Coroner Dr. Terry Welke performed an autopsy and concluded that Dr.

Deshotels was asthmatic, had an anti-depressant in his blood called Effexor and a blood alcohol of

.153.[48]  Dr. Welke reported the cause of death as Excited Delerium.[49]  Plaintiffs dispute Dr. Welke's

findings.

Plaintiffs had a second autopsy performed by Dr. Collie Trant, a board certified forensic

pathologist. Plaintiffs maintain that the autopsy performed by Dr. Welke did not reveal that Dr.

---

[41]  *Id.*

[42]  *Id.*

[43]  *Id.*

[44]  Sheriff's exhibit H, Simon depo. p. 74, lines 16-17.

[45]  *Id.* p. 27, line 22, p. 38, line 13.

[46]  *Id.*

[47]  *Id.* Sheriff's exhibit I.

[48]  Sheriff's exhibit J, Welke depo. pp. 27, 41, 46 and 47.

[49]  *Id.* p. 34.

7

Deshotels was asthmatic, and that Dr. Welke apparently made this conclusion based upon history.

Dr. Trant's report,[50] made the following findings:

>    I. Asphyxia due to injuries resulting from misapplied choke hold
>        A.  Fracture left superior thyroid horn with associated hemorrhage (hyoid bone absent)
>        B.  Marked hemorrhage in the right strap muscles, connective and subcutanious tissues in the right supraclavicular space, and the laryngeal/tracheal submucosa
>        C.  Scattered scleral, conjunctival, and cutaneous facial petechiae
>        D.  Large hematomas over the superior/posterior left ear, and under the left ear, near the angle of the mandible
>    II.  Traumatic asphyxia due to compression of chest and abdomen during struggle with law enforcement personnel
>    III. Asphyxia due to inadequate resuscitative efforts and airway obstruction by gastric contents
>    IV.  Multiple acute blunt force injuries
>        A.  Fractures: See above.
>        B.  Contusions: See above.  Numerous contusions are present in the areas of the left eye, nose, clavicles, left lower back, posterior left shoulder, arms, forearms, wrists, hands, thighs, knees, legs, right foot, and several posterior ribs bilaterally.
>        C.  Abrasions: Right cheek, left elbow, left hand (2), and lateral left calf.  A thin, horizontal, linear, abrasion is present on the lateral left lower forearm
>    V.   Old contusions left hip, left lateral leg, and left elbow
>    VI.  Asthma
>    VII. Acute ethanol use (0.11%)
>    VIII. Acute use of Norvenlafaxine (subtherapeutic)

**CAUSE OF DEATH:**          Asphyxia

**INTERVAL:**          Minutes

**MANNER OF DEATH:**          The manner of death is, in my opinion, homicide.

**COMMENT:**          Being choked unconscious can render one completely confused and disoriented.  This could have caused Dr. Deshotels to do something that was totally uncharacteristic, e.g. fleeing from the police and

---

[50]  Plaintiffs' exhibit 14, p. 1.

struggling with the police and Norsworthy helped them "subdue" him the second time. The inability to free his arms in order to be able to try and raise up off the ground, would have most likely caused more severe confusion and panic, to the point of being terrified, since he was literally fighting to be able to breathe. With someone who is already confused and disoriented, unable to breath, the use of the Taser and it's extreme pain would definitely add to the confusion, as well as make it even more difficult to breath while the Taser was being applied, even though for just seconds. Vomitus in the airway would also contribute to the process of asphyxiation.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, when viewed in the light most favorable to the non-moving party, indicate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[51] A fact is "material" if its existence or nonexistence "might affect the outcome of the suit under governing law."[52]   A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.[53] As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim."[54] Once the movant makes this showing, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial.[55] The burden requires more than mere allegations or denials of the adverse party's pleadings.  The non-moving party must

---

[51]  Fed. R.Civ. P. 56(c).

[52]  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

[53]  *Stewart v. Murphy,* 174 F.3d 530, 533 (5th Cir. 1999).

[54]  *Vera v. Tue,* 73 F.3d 604, 607 (5th Cir. 1996).

[55]   *Anderson,* 477 U.S. at 249.

demonstrate by way of affidavit or other admissible evidence that there are genuine issues of material fact or law.[56]  There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party.[57]  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[58]

## LAW AND ANALYSIS

Plaintiffs are the surviving spouse and children of Dr. Deshotels.  They are suing Mr. Norsworthy, the City of Lake Charles,  law enforcement officers, including Officers O'Rourke, Pittman, Morgan, McCauley, Thacker, and Moss of the LCPD, and Deputies Miller and Marshall of the CPSO, as well as Sheriff Tony Mancuso, in his official capacity.[59]  Plaintiffs' cause of actions include a wrongful death action of their spouse/father and a survival action under 42 U.S.C. § 1983, as well as a state law negligence claim.

Defendants, Mancuso, Miller, and Marshall maintain that they cannot be held liable because (1) there is no proof of a constitutional violation, (2) they are entitled to qualified immunity, and/or (3) they were not negligent.

*Constitutional violation*

Title 42 U.S.C. § 1983 provides in relevant part:

---

[56]  *Celotex Corp. v.  Catrett,* 477 U.S. 317, 324 (1986).

[57]  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

[58]  *Anderson,* 477 U.S. at 249-50.

[59]  Plaintiffs also name various insurance companies.  Complaint, Doc. #1, Amended Complaint, Doc. #45.

10

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress.

The first inquiry in any §1983 suit is to isolate the precise constitutional violation in which the defendant is charged.[60]   The validity of the claim is then judged by reference to the specific constitutional standard which governs that right.[61]   Plaintiffs allege that Defendants used excessive force against Dr. Deshotels while making the arrest and detaining him, and that they were deliberately indifferent to his medical needs while he was in their custody.

*Qualified immunity*

Qualified immunity is an "entitlement not to stand trial or face the other burdens of litigation."[62]   The two step analysis of qualified immunity requires us to determine whether Plaintiffs have alleged the violation of a constitutional right and whether such right was clearly established.[63] The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.[64]

Although "the *Saucier* rule prescribes the sequence in which the issues must be discussed by a court in its opinion, the rule does not-and obviously cannot-specify the sequence in which judges

---

[60]   *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692 (1979).

[61]   *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865 (1989).

[62]   *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806 (1985).

[63]   *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151 (2001).

[64]   *Id.* citing *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692 (1999).

11

reach their conclusion in their own internal thought processes."[65]  Therefore, a court can decide that there was no violation of a clearly established law before deciding whether the relevant facts make out a constitutional question.[66]  Accordingly, the Court may exercise its sound discretion in deciding which of the two prongs in *Saucier* should be addressed first in light of the circumstances in the particular case at hand.[67]

As determined above, Plaintiffs have alleged two constitutional violations: excessive force, (Fourth Amendment) and deliberate indifference to medical needs (Fourteenth Amendment). However, even if this Court were to hold that Deputies Marshall and Miller violated the Fourth and/or Fourteenth Amendment, they could still be granted immunity for a reasonable mistake as to the legality of their actions, and qualified immunity can apply in the event the mistaken belief was reasonable.[68]

*Use of excessive force*

Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is more properly characterized as one invoking the protections of the Fourth Amendment.[69]  The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures" of the person.   A "seizure" triggering the Fourth Amendment's protections occurs only when government actors have, "by means of physical force

---

[65]  *Pearson v. Callahan,* – U.S. – ,129 S.Ct. 808, 820 (2009).

[66]  *Id.*

[67]  *Id.*

[68]  *Id.* citing *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034 (1987).

[69]  *Id.*

or show of authority, . . . in some way restrained the liberty of a citizen."[70]  The use of force is excessive under objective standards of reasonableness.[71]

Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of " 'the nature and the quality of the intrusion on the individuals' Fourth Amendment interests "against the countervailing governmental interests at stake."[72]  The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hind sight.[73]  The "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. [74]  The court must consider the circumstances of each particular case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight.[75]

Defendants, Mancuso, Marshall and Miller maintain that their actions were not an unreasonable use of force given the circumstances.  Plaintiffs maintain that the CPSO Deputies are liable for a Fourth Amendment violation committed by other officers when they are present at the

---

[70]  *Terry v. Ohio,* 392 U.S. 1, 19, n.16, 88 S.Ct. 1868, 1879, n.16 (1968).

[71]  *Id.*

[72]   *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642 (1983).

[73]  *Terry,* 392 U.S. at 20-22, 88 S.Ct. at 1879-1881.

[74]  See *Scott v. United States,* 436 U.S. 128, 137-139, 98 S.Ct. 1717 (1978).

[75]  *Graham,* 490 U.S. at 196, 109 S.Ct. at 1872.

13

scene and do not take reasonable measures to protect an arrestee from another officer's use of excessive force, citing *Hale v. Townley* (theory of bystander liability).[76]  Plaintiffs argue that Deputies Marshall and Miller's conduct was unreasonable and constitute excessive force because they failed to intervene or stop O'Rourke from the alleged unnecessary taserings.

In the *Hale* case, the Fifth Circuit held in affirming a denial of a motion for summary judgment that the district court correctly held that an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under § 1983.  The court further remarked that the fact that law enforcement personnel were from different agencies does not as a matter of law relieve the officers from liability for failure to intervene.[77]

We must determine whether an objectively reasonable law enforcement officer would have known that the degree of force used was excessive in relation to the need for action.  Deputies Marshall and Miller had been dispatched and informed of a trespass, however, they were also aware that the LCPD had been dispatched and were responding to a burglary.  When they arrived at the Nelson Pointe Apartments, they observed Dr. Deshotels actively resisting and struggling with LCPD Officer Pittman despite repeated commands to cease resisting.

Deputies Marshall and Miller's participation in subduing Dr. Deshotels consisted of Deputy Miller kneeling on Dr. Deshotels' shoulder,[78] and Deputy Marshall attempting to reach underneath Dr. Deshotels to gain control of his right arm in order for handcuffs to be placed on him.  Deputy

---

[76]  45 F.3d 914, 919 (5th Cir. 1995).

[77]  Citing *Harris v. Chanclor,* 537 F.2d 203, 205-06 (5th Cir. 1976).

[78]  Plaintiffs' exhibit 5, p. 47.

14

Marshall testified that he did not consider Dr. Deshotels a threat to the safety of the officers or anyone else.[79] Deputy Marshall further testified that he thought the use of a taser was unnecessary.[80] Deputy Miller condoned O'Rourke's use of the taser.[81] There is testimony that the tasering occurred quickly, with very little warning, and with only seconds elapsing from the time the "warning" was given and Dr. Deshotels was tasered.[82]

The Court concludes that Plaintiffs have not established that Deputies Marshall and Miller used excessive force in holding Dr. Deshotels down in order for him to be handcuffed. Furthermore, due to the exigency of the situation, Dr. Deshotels' repeated refusal to cease resisting, and the short period of time lapse between the taser warning and the actual tasering, the Court concludes that Deputies Marshall and Miller's decision not to prevent the tasering, under these circumstances, was not a use of excessive force.

*Deliberate indifference to medical needs*

Plaintiffs next argue that Deputies' Miller and Marshall were deliberately indifferent to the needs of Dr. Deshotels because neither of them rendered first aid or assistance to Dr. Deshotels, a violation of the Due Process Clause of the Fourteenth Amendment. In other words, they failed to provide adequate medical care to Dr. Deshotels prior to EMTs arriving. Defendants rely on the fact that LCPD Officers McCauley and Moss attempted to provide assistance, and maintain that there is

---

[79] *Id.* pp. 48, 55, 81.

[80] *Id.* pp. 54-55.

[81]  Plaintiffs' exhibit 6, pp. 49-50.

[82]  Sheriff's exhibit F, Miller depo. p. 34, lines 23-25, p. 34, lines 9-10; Sheriff's exhibit E, Pittman depo. p. 117, lines 14-15; Plaintiffs' exhibit 5, Marshall depo. pp. 47, 49, 52 and 55; Plaintiffs' exhibit 6, Miller depo. p. 36.

nothing at law to suggest that they owed some duty to act beyond what assistance Officers McCauley and Moss were providing.

Plaintiffs cite *Hare v. City of Corinth*,[83] which held that the episodic act or omission of a state official does not violate a pretrial detainee's constitutional right to be secure in his basic human needs, such as medical care and safety, unless the detainee demonstrates that the official acted or failed to act with deliberate indifference to the detainee's needs. A state official's deliberate indifference, i.e., subjective intent to cause a pretrial detainee harm, cannot be inferred from the official's failure to act reasonably.[84] In other words, "a state [ ] official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk."[85]

Thus, the query is whether Deputies Marshall and Miller had gained actual knowledge of the substantial risk of serious harm and responded with deliberate indifference. The Court is more concerned with these officials, who are hired to protect and serve, yet failed to render proper aid to Dr. Deshotels and potentially allowed him to suffocate on his own vomit, with the knowledge that he was not breathing. Deputy Marshall assisted Officer Pittman in attempting to lift Dr. Deshotels to his feet, however he was unable to stand under his own power.[86] They observed that Dr. Deshotels' face had turned colors – blue– and that he was not breathing.[87]    There is evidence

---

[83]  74 F.3d 633, 650 (5th Cir. 1996)(en banc).

[84]  *Id.* at 649.

[85]  *Id.* at 650.

[86]  Sheriff's exhibit D, Marshall depo. p. 56, lines 6-20.

[87]  *Id.* p. 57, lines 16-25.

16

submitted by Plaintiffs that other Officers observed Deputy Marshall and Officer Pittman dragging Dr. Deshotels as dead weight and that his color had turned blue.[88] Officer Thacker testified that he told Officer Pittman and Deputy Marshall to remove the handcuffs from Dr. Deshotels.[89] There is testimony that Officers McCauley and Moss started assisting Dr. Deshotels by clearing his airway with a Bic pen.[90] But eventually, only Officer McCauley was assisting Dr. Deshotels; all of the other officers walked away.[91] EMTs Siefford and Simon testified about the large amount of vomit covering Dr. Deshotels' face, on the ground, and blocking his airway.[92] EMT Swiefford testified that it appeared that Dr. Deshotel had vomited while lying supine, or while lying on his back.[93] The Calcasieu Parish Coroner's report by Dr. Terry Welke concluded that Dr. Deshotels' death was a homicide caused by "Excited Delirium."[94] A second autopsy was performed wherein Dr. Collie Trant concluded that Dr. Deshotels' death was a homicide caused by "asphyxia".[95] The Court concludes that Plaintiffs have established a possible violation of a constitutional right based on Deputies Marshall and Miller's failure to properly assist Dr. Deshotels when it was obvious that he

_____

[88] Plaintiff's exhibit 8, McCauley depo. pp. 35-36; Plaintiff's exhibit 9, Thacker depo. p. 33, lines 6-8, lines 21-25.

[89] *Id.* p. 34, lines 14-24.

[90] *Id.* p. 40.

[91] *Id.* pp. 40-41; Plaintiffs' exhibit 11, Siefford depo. pp. 24-25, 27, 28; Plaintiffs' exhibit 11, Siefford depo. p. 24, lines 14-25.

[92] Sheriff's exhibit H, Simon depo. p. 74, lines 16-17; Plaintiffs' exhibit 11, pp. Siefford depo. pp. 27-28.

[93] Id. p. 28, lines 12-13.

[94] Plaintiffs' exhibit 12, p. 4.

[95] Plaintiffs' exhibit 14, p. 1.

was not breathing.   Deputies Marshall and Miller's lack of assistance could be considered as "deliberate indifference" to Dr. Deshotels' medical needs.

Because we have determined that there could have potentially been a violation of a constitutional right by Deputies Marshall and Miller, we must next decide, under *Saucier,* if the deputies' conduct was a violation of a clearly established constitutional right, so as to put them on notice that their conduct was unlawful.[96]  In *Saucier,* the court citing *Anderson,*[97] emphasized that "the right the official is alleged to have violated must have been clearly established in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[98]  "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."[99]  Thus, even though we have concluded that there is a possibility that a constitutional violation has occurred (deliberate indifference to medical needs), officers can still be entitled to qualified immunity for reasonable mistakes as to the legality of their actions.[100]

In defending their negligence claims, Plaintiffs cite *Aycock v. City of Shreveport*[101] which

---

[96]   *Saucier,* 533 U.S. at 200.

[97]   438 U.S. at 640.

[98]   *Id.* at 202. (Citations omitted)

[99]   *Id.*

[100]   *Id.* at 206.

[101]   535 So.2d 1006 (La.App. 2d Cir. 1988), *writ denied,* 563 So.2d 1223 (1989)(citations omitted).

18

provides the following jurisprudence concerning a police officer's duty to provide reasonable medical services:

> A police officer must exercise reasonable care to preserve the safety of the person in his custody. Additionally, a police officer owes a higher degree of care to an intoxicated person than to one who is more capable of caring for himself. It is the duty of an arresting officer to see that reasonable medical service is provided to his prisoner if and when his mental and/or physical condition discloses the need of such services.

The Court finds that these Deputies had sufficient knowledge that they owed a duty of care to provide medical assistance to a person in their custody. Thus, the Court concludes that such failure to provide medical assistance is a violation of a clearly established constitutional right, such that these Deputies were sufficiently put on notice that this type of conduct was unlawful. Therefore, Deputies Marshall and Miller are not entitled to qualified immunity.

*CPSO custom or policy*

Defendant Mancuso maintains that even if the Court determines that Dr. Deshotels' Fourth and/or Fourteenth Amendment rights were violated, he cannot be held liable because Plaintiffs have failed to establish that the CPSO adopted or promulgated a custom or policy that was the driving force behind the Officers' violation of constitutional rights – i.e., the CPSO cannot be held liable under § 1983 on the basis of respondeat superior citing *Monell v. New York City Dept. of Social Servs.*[102]

Municipalities and other local governmental bodies are "persons" within the meaning of § 1983.[103] However, a municipality may not be held liable under § 1983 solely because it employs a

---

[102]  436 U.S. 658, 692, 98 S.Ct. 2018, 2037 (1978).

[103]  *Monell,* 436 U.S. at 692.

19

tortfeasor.[104]   Instead, the plaintiff must identify a municipal "policy" or "custom" that caused the injury.[105] The "official policy" requirement was intended to distinguish acts of the *municipality* from the acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to actions for which the municipality is actually responsible.[106]  Thus, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."[107]  "Official policy" often refers to formal rules or understandings–often but not always committed to writing–that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time.[108]  Therefore, Plaintiffs must demonstrate that the municipality was the "moving force" behind the injury alleged.[109]

Defendant Mancuso maintains that Plaintiffs have failed to show that the CPSO adopted or promulgated a custom or policy that was the driving force behind the Officers' alleged violation of constitutional rights.  The Court agrees.  Once the CPSO defendant showed the lack of evidence concerning the policy, practice and custom of the CPSO, the burden of proof shifted to the Plaintiffs to set forth facts through summary judgment evidence to establish that there is a genuine issue for

---

[104]  *Id.* at 692, 98 S.Ct. at 2036.

[105]  *Pembaur v. Cincinnati,* 475 U.S. 469, 480-481,106 S.Ct. 1292, 1298-1299 (1986).

[106]  *Id.*

[107]  *Monell,* 436 U.S. at 694, 98 S.Ct. at 2038.

[108]  *Eambaur v. City of Cincinnati,* 475 U.S. at 480-481.

[109]  *Id.*

20

trial.[110]

The Court notes that in their opposition brief, Plaintiffs have failed to address and/or even submit summary judgment evidence of any policy, practice or custom of the CPSO that would make Sheriff Mancuso liable under § 1983. Furthermore, Plaintiffs have failed to allege in their Complaints,[111] as amended, that there was a CPSO policy, practice and/or custom that was the driving force and causally connected to the arrest, detainment and ultimate demise of Dr. Deshotels.[112]   However, our decision is primarily based on the complete absence of summary judgment evidence to establish that the CPSO had a policy, practice and/or custom that is causally connected with the survival action and the wrongful death action. Accordingly, the § 1983 wrongful death action and survival action against Sheriff Mancuso will be dismissed.

*State law negligence claims*

An employer of a police officer can be liable for the torts committed by the officer during the performance of his official duties.[113] Furthermore, an officer's employer is still held liable in cases where the officer has abused the apparent authority given him by the employer and has committed acts which are not part of his customary duties.[114]

---

[110] Mere allegations are not sufficient in a motion for summary judgment.  *Anderson,* 477 U.S. at 249.

[111] Doc. #1, 17, and 45.

[112] These allegations of policy, custom or practice were alleged, summarily, albeit unnecessarily as to Plaintiff's negligence claims. Complaint #1, ¶ 36.

[113] *Jenkins v. Jefferson Parish Sheriff's Office,* 402 So.2d 669 (La.1981).

[114] *Sullivan v. Quick,* 465 So.2d 254 (La.App. 3d Cir. 1985) citing *Applewhite v. City of Baton Rouge,* 380 So.2d 119 (La.App. 1st Cir. 1979).

21

The standard negligence analysis in determining whether to impose liability under Louisiana Civil Code article 2315 is the duty/risk analysis.[115]  In order for liability to attach, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element), (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element), (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact- element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element).[116]

Defendants maintain that they cannot be liable for state law negligence claims because the conduct of Deputies Marshall and Miller was reasonable under the circumstances.

An excessive force claim in Louisiana is premised largely on Louisiana Code of Criminal Procedure article 220.[117]  Excessive force can be found when an officer makes a lawful arrest.[118] "The use of force when necessary to make an arrest is a legitimate police function."[119]  However, "[w]hether the force used is reasonable depends upon the totality of the facts and circumstances in

---

[115]   *Mathieu v. Imperial Toy Corp.*, 646 So.2d 318 (1994).

[116]   *Id.* at 322.

[117]   LSA-C.Cr.P.Art. 220 provides as follows:

A person shall submit peaceably to a lawful arrest.  The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained.

[118]   *Kyle v. City of New Orleans*, 353 So.2d 969 (1977).

[119]   *Kyle*, 353 So.2d at 972.

each case."[120]  "A court must evaluate the officers' actions against those of ordinary, prudent and reasonable men placed in the same position as the officers and with the same knowledge as the officers."[121]

Factors to be considered are: (1) the character of the arrestee; (2) the risks and dangers faced by the officers; (3) the nature of the offense; (4) the probability of the arrestee's escape; (5) the existence of alternative methods of arrest; (6) the physical size, strength, and weaponry of the officers as compared to the arrestee; and (7) the exigencies of the moment.[122]  Considering these factors which are similar to the factors we considered when analyzing the § 1983 claim of excessive force, the Court for the same reasons set forth above finds that Deputies Marshall and Miller's actions in arresting and placing Dr. Deshotels under custody were reasonable under the circumstances.

Plaintiffs maintain that Deputies Miller and Marshall breached their duty to provide medical services to Dr. Deshotels.  As previously stated, Deputies Miller and Marshall had a duty to preserve the safety of the person in their custody.  In particular, a police officer owes a higher degree of care to an intoxicated person than to one who is more capable of caring for himself.[123]  Deputies Miller and Marshall had a duty to see that Dr. Deshotels was provided reasonable medical service because of his physical condition – not breathing– a condition that the evidence suggests they were acutely aware of.  Instead, Deputies Miller and Marshall chose to walk away and render no first aid or

---

[120]  *Id.* at 973.

[121]  *Id.*

[122]  *Id.* at 973.

[123]  *Aycock,* supra.

medical assistance whatsoever.  The Court concludes that Deputiess Miller and Marshall owed a duty to Dr. Deshotels to provide some type of medical assistance.  However, we are not ruling at this stage of the proceeding that Deputies Marshall and Miller breached that duty.   Plaintiffs have presented sufficient evidence to create a genuine issue of material fact for trial as to whether that duty was breached.  Plaintiffs must also prove that the breach of that duty was the cause in fact and legal cause of Plaintiffs' damages.  Having so concluded, the motion for summary judgment to dismiss Tony Mancuso in his official capacity, and Deputies Miller and Marshall in their official capacities will be denied.

## CONCLUSION

Based on the foregoing and for the reasons herein, the motion for summary judgment will be granted in part and denied in part.  The motion will be granted to the extent that Plaintiffs' § 1983 claims of survival action and wrongful death action against Sheriff Tony Mancuso will be dismissed; the excessive force claims as to § 1983 and negligence against Deputies Marshall and Miller will be dismissed; otherwise the motion for summary judgment will be denied.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 8th day of March, 2010.

_____
JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE

24